*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THERESA EILEEN CRAWFIS,

Plaintiff-Appellant,

v

BRADY WALTER CRAWFIS,

Defendant-Appellee.

UNPUBLISHED
May 21, 2020

No. 347102
Otsego Circuit Court
Family Division
LC No. 17-17096-DM

Before: TUKEL, P.J., and MARKEY and GADOLA, JJ.

PER CURIAM.

Plaintiff appeals by right the judgment of divorce entered by the trial court following a one-day bench trial. Plaintiff raises issues concerning spousal support, the division of the parties' heating and cooling business, the treatment of a down payment that plaintiff made on the parties' first home using mostly inheritance money, and the repayment of a loan made by plaintiff's parents. We affirm.

## I. BACKGROUND

Plaintiff was born on January 1, 1960, and defendant's date of birth is November 29, 1969. The parties were married on October 10, 1993. A few months before the marriage, the parties purchased a home in the Traverse City area. Plaintiff paid the entire down payment of $14,900, which consisted mostly of inheritance money that she had received. To various extents, both parties were involved in maintenance, repair, and upgrade activities with respect to the house, which we discuss in greater detail below. When the parties married in 1993, defendant was employed at Geothermal Systems, and plaintiff worked in two children's clothing stores located in Traverse City and Gaylord, which were owned by plaintiff's mother. The parties have two children, a son and a daughter, and only their daughter remained a minor at the time the divorce complaint was filed in December 2017.

Plaintiff assumed ownership and operation of the two children's clothing stores when plaintiff's mother retired in 1996. Plaintiff immediately closed the Traverse City store, and the parties sold their home in Traverse City and moved to Gaylord, where plaintiff operated the Gaylord store. The proceeds from the sale of the Traverse City home were used to pay the entire

-1-

down payment on the house in Gaylord. As before, both parties, to various extents, were involved in maintaining, repairing, and upgrading the Gaylord house.

In 1998, the parties, as incorporators, formed Brady's Heating & Cooling, Inc. (BHC). They were the two sole shareholders, each holding a 50% interest. Defendant did the field work on heating, venting, and air conditioning (HVAC) repairs and on HVAC-system installations for new construction projects.[1] Within a couple of years of starting BHC, plaintiff began taking care of much of the paperwork for BHC because defendant found that aspect of the business to be very stressful. She handled the bills, invoicing, accounts payable, and payroll for BHC. Plaintiff continued to operate the children's clothing store. BHC was the primary source of the family's income for essentially the remainder of the marriage. Plaintiff did not receive a salary or pay for doing BHC's paperwork. Plaintiff testified that money generated by the business went into a BHC bank account and, after payment of costs and overhead, would subsequently flow to a family checking account.

The parties built a new house in 2002 near Vanderbilt, using the proceeds from the sale of the Gaylord house. Both parties were involved to varying degrees with respect to the construction of the home and finishing work. Defendant did much of the work on the home himself and directed various contractors in completing the project. Plaintiff continued to operate the children's clothing store in Gaylord until 2005 when she shuttered the business. Plaintiff then began working part-time as a teacher's aide, which she did until quitting around 2014. Plaintiff testified that in 2010 or 2011 she also started part-time employment as a rural mail carrier. During these years, plaintiff continued taking care of paperwork for BHC.

The parties separated and defendant moved out of the marital home in June 2017. He moved into a friend's converted pole barn, paying $400 a month in rent. In December 2017, plaintiff, who remained in the marital home at the time, filed for divorce. In January 2018, BHC accepted a loan of $5,000 from plaintiff's parents.[2] Defendant signed a promissory note or loan document on behalf of BHC, which was admitted into evidence but was not included in the lower court record transmitted to this Court. Both parties agreed to ask for and to receive the loan. The evidence indicated that the loan proceeds were put into a BHC checking account where parties accessed the funds to pay family bills and expenses and to cover certain BHC-associated costs. Both parties agreed that January was typically a very slow month for the business although plaintiff also accused defendant of not making an effort to work as much as he could. In the spring of 2018, the parties sold a BHC tractor for approximately $17,500, and the proceeds from the sale were used to pay off the balances on two credit cards. In March 2018, plaintiff started working full-time as a mail carrier. Plaintiff testified that until March 2018, the family's finances were treated as one, i.e., no differently from before their separation.

---

[1] Over the course of time, defendant had obtained licenses as a homebuilder, master plumber, and mechanical contractor. It does not appear that BHC employed anyone but defendant with respect to performing HVAC work.

[2] Plaintiff's parents had also loaned $4,500 to the parties that was used to purchase a car for their daughter, and at the time of the divorce $1,907 remained owing on that debt.

By agreement in April 2018, defendant was ordered to pay child support in the amount of $574 per month, along with an initial payment of $1,500. While defendant delayed in paying some of the amounts, he eventually paid a lump sum amount, satisfying his obligation. The parties' daughter turned 18 years old on August 7, 2018, and she left home for St. Mary's College in late August of that year. When their daughter left for school, plaintiff moved out of the family house and into her parents' home. Plaintiff claimed that she made the move because her parents were ill and elderly, and she could not afford to stay in the parties' house. The parties agreed to sell the marital home at a starting price of $350,000. The house had an existing mortgage balance of $81,457. Although the parties agreed to sell the marital home, they disputed how the proceeds should be divided: plaintiff wanted a 60%-40% split in her favor and defendant sought a 50%-50% division. The parties also reached an agreement regarding the division of personal property, except for a garage refrigerator and a dining room chandelier, but they then agreed on those items during the trial. Plaintiff stipulated to defendant's receiving BHC, its assets and liabilities;[3] she did not ask for any setoff for surrendering her interest. But plaintiff did request an award of alimony in gross because for years, in part, she had handled the paperwork for BHC without direct compensation.

On November 1, 2018, the parties appeared for the first day of trial. The court noted that it received a report that defendant smelled of alcohol. Defendant denied that he had been drinking. With defendant's consent, the trial court had an officer administer a PBT to defendant; it was shown to have a blood-alcohol level of .114. The court adjourned the trial to the next day and later held defendant in contempt for being intoxicated in court. He was fined and ordered to pay costs incurred by plaintiff. On November 2, 2018, the bench trial commenced and concluded later that day. The parties each testified and introduced a number of exhibits. We will review additional trial testimony to fill in some of the details of the case.

During the trial, plaintiff pursued reimbursement for various costs and expenses that she incurred in the spring of 2018, which was after defendant moved out of the marital home. In the middle of the trial, however, the parties resolved the matter with defendant's agreeing to pay plaintiff $5,081. The parties could not resolve an issue concerning repayment of the $5,000 owed to plaintiff's parents on the BHC loan; plaintiff demanded that defendant pay the full amount, and defendant sought to divide the debt equally. In regard to the parties' monthly expenses, there was also a dispute concerning a large vehicle payment defendant was making on an expensive truck that plaintiff never wanted him to purchase in the first place. Plaintiff still owed $7,000 on her 2009 Honda CRV, which she retained in the divorce.

There were no ongoing issues regarding child support or custody in light of the fact that the youngest child was now 18 years old. Some of the trial testimony did focus on promises to share in paying the costs of their daughter's college education. Income tax returns for BHC covering tax years 2014 through 2017 were admitted into evidence. There was no evidence of any business valuation of BHC, and neither party attempted to place a value on the business. With

---

[3] This did not encompass the $5,000 loan to BHC from plaintiff's parents, which the trial court ultimately ordered both parties to repay out of the proceeds from a sale of the marital home.

respect to income, plaintiff testified that she was making $19 per hour as a mail carrier, giving her an annual income of $43,800.[4] She had health insurance through her employment and had just recently begun building a retirement fund through her job upon becoming full-time in March 2018.[5] The health insurance covered the parties and their daughter, and defendant would be losing that coverage on entry of the divorce judgment.[6] Defendant has no health insurance, nor any kind of retirement plan. He viewed the house as a retirement asset.

Defendant annually earned in the $30,000 to $40,000 range through BHC, as reflected in tax documents. Plaintiff claimed that defendant offered customers discounted rates on HVAC projects if customers paid in cash and that on occasion defendant would keep the cash as a side stash for hunting and fishing trips. Defendant acknowledged that he did so but that it was a very seldom occurrence, entailing only three hunting/fishing trips over the years, which cost him $5,500 to $6,000 in total. Plaintiff believed that defendant would accept cash payments more often and keep the money for himself instead of using it for the family. Defendant testified that he generally started his work day around 7:00 a.m. and worked until anywhere between 3:00 and 6:00 p.m., depending on the nature of the HVAC repair or project. Plaintiff testified that defendant bid out HVAC jobs to make $500 per day. Plaintiff claimed that since defendant left the marital home in June 2017 he was not making a full effort in operating the business. Plaintiff also asserted that defendant could easily obtain a job with various contractors because he did excellent work. She commented that defendant had told her over the years of contractors who would be interested in hiring him. Plaintiff testified that defendant had the ability to earn much more money in light of his various licenses. Defendant testified that he was working as much as possible, that BHC currently had five to six jobs or projects, and that he owed suppliers $6,500.

There was no testimony regarding the physical health of the parties. Defendant indicated that his work could be physically demanding at times, as did plaintiff regarding her job as a rural mail carrier. Defendant is nine years younger than plaintiff. Both parties acknowledged that they would have to eventually find more permanent housing, and defendant recognized that the cost to him for housing would likely be less because he could use his skills to build a home or rehabbing a cheaper one. The parties were anticipating using some of the proceeds from the sale of the marital home to acquire future housing.

## II. THE TRIAL COURT'S RULING AND THE JUDGMENT OF DIVORCE

The trial court rendered its findings and rulings from the bench. We note that the court was very thorough and thoughtful in reviewing the evidence, analyzing the issues, and coming to resolutions. We will refer to the specifics of the trial court's decision-making in the analysis section of this opinion when relevant to addressing the issues on appeal. We will, however, touch

---

[4] Plaintiff has a high school degree and a year and a half of college coursework.

[5] The record is not exactly clear on the matter, but it appears that plaintiff only had a couple of thousand dollars at most in her retirement account.

[6] Plaintiff testified that the family had health insurance in earlier years through the operation of the children's clothing stores.

on a few matters at this juncture. The trial court indicated that it found both parties to be very credible witnesses, and it complimented them on their reasonableness in addressing issues and their civility toward each other. With respect to their incomes, the trial court decided to use the latest numbers employed by the friend of the court in calculating support. Thus, in regard to plaintiff, the court found that she had an annual income of $42,000, a gross monthly income of $3,500, and a net monthly income of $2,774. As to defendant, the trial court found that he had an annual income of $50,000, which evidently included some imputed income, a gross monthly income of $4,166, and a net monthly income of $3,059.[7] With respect to the $14,900 inheritance-related down payment that plaintiff made on the parties' first house in 1993, which she argued should be awarded to her as a premarital, separate asset, the trial court concluded that the funds had been sufficiently comingled over the years such that the money lost its identity as premarital property. The court also ruled that the parties would be equally liable on the $5,000 loan from plaintiff's parents, as well as in regard to the $1,907 balance on the other loan from the parents.

The judgment of divorce that was subsequently entered provided that plaintiff shall be paid alimony in gross upon the sale of the marital home. Three percent of plaintiff's share of the proceeds from the sale was to be considered alimony in gross. The award was final, binding, and nonmodifiable. With respect to the marital home, the divorce judgment provided as follows:

> The marital home shall be listed for sale. The parties shall agree on the listing price and acceptance of any offers. If the parties do not agree on a price and acceptance of any offers, the parties shall each obtain certified appraisals of the property within 30 days of the disagreement. The price will be set at the average of the two appraisals. Each party shall be responsible for 50% of the household expenses until the house is sold. Any improvements made to facilitate the sale of the marital home shall be made by written agreement of both parties. The proceeds shall be divided with Plaintiff receiving 53% of the proceeds and Defendant receiving 47% of the proceeds.

Under the terms of the judgment of divorce, the trial court awarded BHC to defendant, and plaintiff was given 30 days to execute documents necessary to remove her name from the business. The divorce judgment further provided that plaintiff's "claim of $14,900.00 premarital contribution to the first marital home as separate property is ordered to be joint marital property because of the co-mingling through two subsequent homes . . .," and "shall not be awarded separately to [p]laintiff." The $5,081 that defendant agreed to pay plaintiff to cover marital bills that were incurred after separation was to be paid in monthly installments of $500 beginning on December 1, 2018, with defendant to pay the entire balance, if any, when the marital home was sold. With respect to the $5,000 and $1,907 debts owed to plaintiff's parents, the divorce judgment

---

[7] The trial court indicated that it was not prepared to impute any income to defendant, aside from any amount already encompassed by the friend of the court's figures, because there was no evidentiary basis to do so, especially in light of the tax returns. Although the court recognized that defendant had occasionally accepted cash on the side, there was no certainty that he would be able to do so in the future, and the court believed defendant's testimony that he was not currently working for cash payments.

provided that they were to "be paid from the proceeds from the marital home with each party paying 50%." The divorce judgment indicated that these debt repayments were to come from the parties' respective checking accounts after receipt of the proceeds from the sale; it did not provide for distribution to the parents as part of a real estate closing. The judgment of divorce also directed each party to pay 50% of their daughter's tuition. Plaintiff appeals by right.

## III. ANALYSIS

## A. SPOUSAL SUPPORT

Plaintiff first argues on appeal that the trial court erred by failing to assign any value to plaintiff's voluntary divestiture of her 50% interest in BHC when determining the amount of spousal support.

We review a trial court's award of spousal support for an abuse of discretion. *Loutts v Loutts*, 298 Mich App 21, 25; 826 NW2d 152 (2012). "An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). Any findings of fact related to a spousal support award are reviewed for clear error. *Id.* A finding of fact "is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made." *Id.* Deference is given to a trial court's findings of fact that are based on the credibility of witnesses. *Id.*

MCL 552.23(1) contemplates a case-by-case approach in determining an award of spousal support. *Loutts*, 298 Mich App at 29-30.[8] "The primary purpose of spousal support is to balance the parties' incomes and needs so that neither party will be impoverished, and spousal support must be based on what is just and reasonable considering the circumstances of the case." *Id.* at 32. "Spousal support does not follow a strict formula." *Id.* at 30.

A court should consider all relevant factors in determining an appropriate award of spousal support, including:

> (1) the past relations and conduct of the parties; (2) the length of the marriage; (3) the abilities of the parties to work; (4) the source and the amount of property awarded to the parties; (5) the parties' ages; (6) the abilities of the parties

---

[8] MCL 552.23(1) provides:

> Upon entry of a judgment of divorce or separate maintenance, if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

to pay support; (7) the present situation of the parties; (8) the needs of the parties; (9) the parties' health; (10) the parties' prior standard of living and whether either is responsible for the support of others; (11) the contributions of the parties to the joint estate; (12) a party's fault in causing the divorce; (13) the effect of cohabitation on a party's financial status; and (14) general principles of equity. [*Woodington*, 288 Mich App at 356 (citation omitted).]

In the instant case, we reject plaintiff's argument that the trial court erred by failing to assign any value to plaintiff's voluntary divestiture of her 50% interest in BHC when determining the amount of spousal support. This argument is entirely lacking in merit. Plaintiff stipulated to defendant's keeping the business, and she never sought any offset for surrendering her one-half interest in the corporation. "A party may not claim as error on appeal an issue that the party deemed proper in the trial court because doing so would permit the party to harbor error as an appellate parachute." *Hoffenblum v Hoffenblum*, 308 Mich App 102, 117; 863 NW2d 352 (2014) (quotation marks and citation omitted).

Moreover, plaintiff did not present any evidence regarding the value of BHC, nor did she argue that BHC had any ongoing value.[9] No business valuation was performed.[10] Even if this Court wished to attribute a value to the business for purposes of increasing the award of spousal support, we would have absolutely no basis for doing so. Plaintiff's reliance on *Hanaway v Hanaway*, 208 Mich App 278, 285-286; 527 NW2d 792 (1995), is misplaced because in *Hanaway* there was an abundance of evidence regarding the valuation of the business at issue, and there was no stipulation that precluded consideration of the issue on appeal.

---

[9] Defendant also did not present evidence regarding BHC's value for purposes of property division.

[10] In *Jansen v Jansen*, 205 Mich App 169, 170-171; 517 NW2d 275 (1994), this Court discussed the valuation of a business in the context of a domestic relations action:

> Next, defendant asserts that the trial court erred in its valuation of plaintiff's business assets and continues to argue that her expert witness was more credible than plaintiff's expert witness. We find no clear error. The valuations of the parties' experts varied widely and were the subject of much dispute at trial. The trial court made its own evaluation on the basis of all the evidence presented, and, while some of the trial court's individual determinations may have been miscalculated, the court's valuation was within the ranges established by the testimony. A trial court has great latitude in determining the value of stock in closely held corporations, and where a trial court's valuation of a marital asset is within the range established by the proofs, no clear error is present.

In taxation cases, "[t]he three most common approaches for determining true cash value are the capitalization-of-income approach, the sales-comparison or market approach, and the cost-less-depreciation approach." *Great Lakes Div of Nat'l Steel Corp v City of Ecorse*, 227 Mich App 379, 390; 576 NW2d 667 (1998). But "variations of these approaches and entirely new methods may be useful if found to be accurate and reasonably related to fair market value." *Id.*

Plaintiff next argues that the trial court's award of spousal support was inequitable. Plaintiff contends that the court improperly found that the earning capacity or ability of the parties was about equal, considering that plaintiff made $19 per hour and defendant had three trade licenses that allowed him to bid out HVAC projects to make $500 per day, bill services at $59 to $65 per hour, collect off-the-books cash payments, and substantially upgrade any house that he purchases.

The trial court thoroughly examined and evaluated all of the spousal support factors and concluded that they were fairly equal but favored an award of spousal support in some amount, primarily because of the nine-year difference in the parties' ages. The court did initially state "that the earning ability of the parties is relatively equal." But the trial court later observed, more than once, that defendant had a greater earning capacity than plaintiff. This conclusion, however, was based solely on the difference in ages. The trial court explained that the age difference affected earning ability because of "the time value of money" and because of the time left for each of them to perform in their respective careers. Therefore, the court did not take into consideration the factors plaintiff raises on appeal. Nonetheless, reversal is not warranted.

First, even though the evidence showed that defendant was earning between $30,000 and $40,000 annually with BHC, the court treated him as earning $50,000 per year. With respect to plaintiff's testimony that defendant bid out jobs to make $500 a day and her claim that he charged $59 to $65 per hour for services, we note there was no testimony or evidence giving any context to these numbers. Plaintiff seems to suggest that defendant was netting these sums day-in and day-out without considering whether costs and expenses or downtime were taken into account. There is simply no evidence indicating that defendant was making more than $50,000 a year and even that number was higher than the tax returns indicated. We appreciate that there was testimony that defendant pocketed cash payments for his services at times, but there is simply no evidence regarding a particular amount, except for defendant's testimony that it totaled $5,500 to $6,000 relative to three sporadic hunting and fishing trips. With regard to defendant's ability to upgrade any house that he purchases, we do not view that as a sufficient reason to find an abuse of discretion and order an award of more spousal support. Further, although defendant could perhaps earn more money if he took up employment elsewhere, we cannot expect or require him to give up his own business and the perks that go along with being one's own boss. Additionally, there was no proof establishing that defendant was passing up HVAC repairs and projects that were actually available in an attempt to lower his income for purposes of the divorce proceedings. Moreover, it in fact appears that the friend of the court imputed income to him.

Under the circumstances presented, we cannot conclude that the trial court abused its discretion by awarding plaintiff alimony or spousal support in gross as represented by a 53% to 47% split in the proceeds of a sale of the home, as opposed to the requested 60% to 40% split. We note that defendant is going to have to obtain health insurance, and he has no retirement plan or account.

Plaintiff next contends that the award of spousal support was inequitable because the award equals, at most, only about $14,000 despite the availability of a marital asset—the house—with more than $200,000 in net equity, despite a marriage of over 25 years, and despite an age differential of nearly ten years in defendant's favor.

If the house sold for $350,000, and assuming a 7% real estate commission as discussed during the trial, the net proceeds, after deducting the mortgage balance of $81,457 and the $6,907 in outstanding loans, would equal $237,136.[11] An equal division would amount to each party receiving $118,568. Under the divorce judgment's 53% to 47% division, plaintiff would receive $125,682, and defendant would receive $111,454, which is a difference of $14,228. Under plaintiff's request for a 60% to 40% division in her favor, plaintiff would receive $142,281, and defendant would receive $94,855. We cannot conclude, under the facts presented in this case, that the trial court abused its discretion by awarding plaintiff 53% of the net proceeds as opposed to 60% for purposes of spousal support in gross.[12]

The lengthy marriage did not necessitate additional spousal support. This is not a case in which one spouse stayed home, raised the children, did not work outside the house, and lacked the ability to successfully enter the workforce late in life upon the dissolution of a long marriage. Plaintiff worked throughout the marriage, as did defendant, and plaintiff is gainfully employed as a fulltime mail carrier making an income comparable to defendant's income and receiving benefits not enjoyed by defendant. Also, it was the parties' age difference that caused the trial court to conclude that plaintiff was entitled to some amount of spousal support. We opine, given the facts presented, that no award at all, the amount actually awarded, and the award sought by plaintiff would all fall within a range of reasonable and principled outcomes.

## B. THE DOWN PAYMENT ON THE FIRST HOUSE

Plaintiff argues that the trial court erred by determining that her $14,900 down payment from her own inheritance-heavy savings for the premarital purchase of the parties' first house had been comingled with other assets and was no longer her separate property.

With respect to appellate review regarding the division of marital assets, this Court in *Richards v Richards*, 310 Mich App 683, 693-694; 874 NW2d 704 (2015), stated:

---

[11] We recognize that the mortgage balance would be lower when a sale was subsequently completed.

[12] The house apparently sold for $310,000 in June 2019, as reflected at www.zillow.com. Using the same deductions as before, the net proceeds following the sale would have been $197,136. Under the divorce judgment's 53% to 47% division, plaintiff would have received $104,482, and defendant would have received $92,654, which is a difference of $11,828. Plaintiff argues that the court should not have operated on the assumption that the house would sell for $350,000 and "should have taken judicial notice of a well-known fact that, with very few exceptions, homes sell for substantially less than their listing price." First, the parties accepted proceeding on the basis that the house could sell for $350,000. Also, in no sense or manner does judicial notice apply to plaintiff's factual proposition. See MRE 201. Plaintiff hypothesizes a sale of $310,000, which has evidently come to fruition, and argues that plaintiff's proceeds "would be substantially less than $14,000." Our calculation reveals a $2,400 difference, which we do not find consequential in assessing whether the trial court abused its discretion, assuming we were to accept plaintiff's premise.

We consider the trial court's findings of fact under the clearly erroneous standard. If the findings of fact are upheld, we must decide whether the dispositive ruling was fair and equitable in light of those facts. The trial court's dispositional ruling will be upheld, unless this Court is left with the firm conviction that the division was inequitable. [Quotation marks, citations, and alteration omitted.]

This Court generally defers to the trial court's credibility findings. *Woodington*, 288 Mich App at 358.

With some exceptions, property that is acquired or earned during the marriage is generally considered marital property. *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010), citing MCL 552.19. Conversely, assets that are obtained or earned before the marriage are typically considered separate assets. *Cunningham*, 289 Mich App at 201. Separate assets can lose their character as separate property and transform into marital property when they are commingled with marital assets and treated by the parties as marital property. *Id.* This Court in *Reeves v Reeves*, 226 Mich App 490, 496; 575 NW2d 1 (1997), did state that a "down payment, the equity built up before the parties' marriage, and any appreciation that occurred before the parties' marriage" can be considered part of a separate estate. The *Reeves* panel, however, also indicated that a separate estate can be invaded when the other spouse contributed to the acquisition, improvement, or accumulation of the property. *Id.* at 494-495.

We conclude that given that the parties sold the first home, used the proceeds to purchase the second house, sold the second home, and then used the proceeds to build the third house, the $14,900 down payment plaintiff made over 25 years ago was effectively comingled with marital funds and assets. The down payment lost its character or identity as separate property, especially considering that marital funds were used to make mortgage payments and repairs over the years. In *Pickering v Pickering*, 268 Mich App 1, 12-13; 706 NW2d 835 (2005), this Court confronted a similar situation, stating:

> Of the $22,000 of personal assets defendant claims he brought into the marriage, $19,876 is alleged to be equity in the parties' first home. Defendant funded the purchase of the property and the down payment on a home that the parties built together before the marriage. The parties moved into the home when it was completed one month before their marriage. The parties resided in the home for approximately fifteen years, paying the mortgage and making improvements with marital funds. The home was eventually sold, and the proceeds were reinvested in a new marital home that was jointly titled. Under the circumstances, we conclude that the trial court properly found that plaintiff's alleged contribution lost any characteristic of being separate property.

Moreover, defendant testified that with respect to the first home in Traverse City, he built a concrete apron in front of the garage, remodeled a bathroom, redid drywall in the basement, and performed substantial landscaping. Defendant further testified that in regard to the second home in Gaylord, he put on a new roof, replaced the siding, remodeled a bathroom, and redid the kitchen flooring. Finally, defendant testified that with respect to the third home in Vanderbilt, he directed contractors regarding the foundation and framing, constructed the in-floor heat systems in the basement and garage, and "did all the soffit, fascia, siding, electrical, plumbing, mechanical,

-10-

insulation, . . . flooring, cabinet installations," and finishing work.  Defendant greatly contributed to the improvement of the homes.  Under these circumstances, we cannot conclude that the trial court erred by declining to recognize the $14,900 down payment as plaintiff's separate property.[13]

## C.  REPAYMENT OF $5,000 LOAN FROM PARENTS

Finally, plaintiff maintains that the trial court erred by ruling that plaintiff was responsible for repaying half of the $5,000 loan her parents made to BHC, where it was used by defendant to fulfill his household-expense commitments.

The January 2018 loan was made to BHC, and the parties were both equal shareholders in the corporation.  Some of the money was used to cover business costs and expenses.  Plaintiff testified that her parents had loaned them money in the past when business for BHC was slow, which was not uncommon during the winter.  There was no evidence that defendant was intentionally passing up offered work in January 2018, and the loan proceeds were used to great extent to cover family expenses.  When plaintiff was asked why defendant should be made to pay the entire $5,000, she said more than once, "I don't know."  We conclude that the trial court did not err in ordering the parties to share equally in repaying the debt.

We affirm.  Having fully prevailed on appeal, defendant may tax costs under MCR 7.219.

/s/ Jonathan Tukel
/s/ Jane E. Markey
/s/ Michael F. Gadola

---

[13] We acknowledge that plaintiff also did her fair share of work on the homes, primarily in regard to painting and varnishing.